**People of the State of Illinois, Plaintiff-Appellee, v. Betty Wilson, Defendant-Appellant.**

**Gen. No. 10,762.**

Fourth District.

February 2, 1967.

Burt Greaves, of Champaign, for appellant.

John J. Bresee, State's Attorney of Champaign County, of Urbana, for appellee.

TRAPP, J.

Defendant appeals from a judgment of conviction of voluntary manslaughter following a bench trial upon an indictment in counts charging murder and involuntary manslaughter, respectively.

Following the post-trial motion, defendant withdrew her petition for probation, and evidence in mitigation and aggravation was waived. The court, upon evidence heard during the trial, imposed a sentence of two to fourteen years.

The issues raised relate to the event of the death of defendant's husband at the home of the parties in Urbana, Illinois, on April 2, 1965. The autopsy established that the cause of death was a single wound penetrating the chest wall and right ventricle of the heart resulting in a massive internal hemorrhage which, in the opinion of the pathologist, would cause the victim to go into shock within 15 minutes with death ensuing in 35 minutes. It was the opinion of this witness that decedent could walk about after receiving the wound until the onset of shock.

Defendant's theory is stated to be that the evidence failed to prove the defendant guilty of any crime beyond a reasonable doubt, and that none of the evidence supports the judgment of voluntary manslaughter. It is further urged that the corpus delicti was proven by an extrajudicial confession alone, and that certain admissions made by the defendant are not sufficient to authorize conviction. Finally, it is contended that the evidence introduced by the State developed elements of self-defense and that there was a failure to prove defendant guilty beyond a reasonable doubt upon this issue.

The framework of time established for the tragedy begins with fair certainty at about 6:00 p. m. when a neighbor observed the defendant and her husband in the driveway of their home and testified that she heard the defendant addressing her husband with profane and obscene language. The decedent was described by the witness as saying nothing, grinning and turning away.

At 8:18 p. m. the Urbana police received a call from the home of the defendant and four officers arrived within minutes to be admitted together into the house

by defendant's brother, Artie Pellum. The officers immediately observed that the decedent was lying between twin beds in a bedroom, his feet toward the door of the room, and that the defendant was kneeling at his feet. Upon immediate examination by the police, they were unable to discover any pulse or respiration and the decedent was declared dead upon arrival at a hospital.

There is substantial agreement in the testimony of the four officers that at the time they entered the room and observed the defendant, she was crying and saying, "I did it—I didn't mean to. He was going to beat me again," and that this was repeated several times as they were in the room making the physical examination of the decedent.

The police officers testified that shortly thereafter they were with the defendant in the kitchen of the home and that in response to questions, the defendant stated that she and her husband had been arguing in the living room and she had gone to the kitchen, obtained a knife from a rack and returned with it and struck the decedent once with a knife. At that moment the parties were just inside the living room door, and several drops of blood were found upon the floor in that area. She stated that he pulled the knife out, walked to the kitchen sink and washed it and put it back on the rack and that was the last she could recall.

Considerable blood was discovered to be in the lavatory and various parts of the bathroom, and blood and mucus in the area of decedent's mouth as he lay on the floor between the twin beds. The police discovered the body naked from the waist up, and a "T shirt" pierced and stained with blood was discovered wadded up upon one of the beds adjacent to the decedent's body. No knife found upon the premises was conclusively identified as the one used. The evidence is that in reply to questions, the defendant stated that the police could find it themselves.

The interval of time between 6:00 p. m. and the arrival of the police officers is only described through the testimony of Artie Pellum, a brother of the defendant. In summary, he testified that he telephoned the defendant at 7:30 or 7:45 asking her to do his laundry to which she assented, that he arrived at the home in 15 or 20 minutes and entered the back way to find defendant sitting at the kitchen table. He stated that he was there about 10 minutes and defendant asked him to take her to get some hamburgers to deliver to defendant's son who worked at a filling station, that they went to the hamburger place staying about 10 minutes, and then went on to the station where the son worked staying about 15 minutes. At this time the defendant purchased cigarettes. He testified that they returned to defendant's home and the latter took her coat into the bedroom at which time she screamed or called and he went into the room to discover decedent's body, and that in about 5 minutes after seeking to locate a doctor, he called the police.

A statement by the trial court at the time of announcing the conviction discloses that the court concluded that Pellum was impeached upon certain points, i. e., his denial that upon two occasions he had told investigating officers that as they returned from delivering the hamburgers she had stated that she had stabbed her husband, and upon his further denial that at about midnight on April 2nd while at the home of neighbors of the defendant, he had stated that he saw decedent's feet as he lay between the beds at the time he, Pellum, had brought the laundry to defendant's home. It appears to us that the record supports the trial court's determination. An examination of the record leads to the conclusion that there is no evidence which contradicts the evidence offered by the State as to the conduct and statements of the defendant at the time the police came to the scene. The defendant did not testify, and the testimony of the brother, Pellum, is that while he was

present throughout the preliminary investigations he cannot recall what was said or done. He stated that he believes the police asked the defendant what happened, but that he doesn't know what was said in reply. This is explained by his statement that he was wandering from room to room and was not listening to what was being said. Defendant's sister, Mrs. Millage and the latter's husband, came to the home sometime after the matters set out had transpired. They contradicted the testimony of Officer Broderick, who was related by marriage to the defendant, that while the Millages were at the home defendant stated that she had stabbed the "son-of-a-bitch," but they agree with Broderick that the defendant had been quarreling with Mrs. Millage, in profane terms, concerning other matters.

We have examined authorities cited by the defendant upon her proposition that statements considered as admissions made at the scene by the defendant and in evidence, will not support a conviction. People v. Nitti, 312 Ill 73, 143 NE 448 and People v. Hobbs,. 400 Ill 143, 79 NE2d 202, relate solely to the proposition that admissions will not be implied by silence when statements were made in the presence of the person subsequently accused. It is to be noted that in each case vigorous denial of the charge was made by the respective defendants during the course of the trial.

 Defendant argues that there was no proof of the corpus delicti except through the extrajudicial confession of the defendant. This does not appear to be, in fact, the rule. In People v. Manske, 399 Ill 176 at p 184, 77 NE2d 164, it is said:

> "It is contended, however, that the corpus delicti cannot be established by the statements of the defendant. This is not an accurate statement of the law. The well-settled rule is laid down in Campbell v. People, 159 Ill 9, as follows: 'It is, however,

familiar law, and frequently recognized by this court, that extra-judicial confessions of the commission of crime, where such confessions are relied upon to establish guilt, are not sufficient to authorize a judgment of conviction without other sufficient proof of the corpus delicti, but that the corpus delicti should first be otherwise established, not, however, necessarily by direct evidence only. (Citations)' This case has been cited and followed a great number of times and is settled law upon the subject. The point to be noticed, however, is that the corpus delicti, that is, the death and the criminal agency, cannot be established by the extra-judicial confession of the defendant. A confession is an acknowledgment of guilt, and not of any particular fact connected with the case, and the rule was doubtless adopted because in the past instances had occurred where defendants, under promises or threats, confessed to the murder of missing persons, who, in fact, were afterwards found to be living."

■ ■ The corpus delicti includes the elements of the death of the victim and that such death resulted from a criminal agency. People v. Melquist, 26 Ill2d 22, 185 NE2d 825; People v. Jones, 22 Ill2d 592, 177 NE2d 112. The proof of the corpus delicti does not include the proof of the identity of the person who committed the homicide and the identity of the latter must be proven beyond a reasonable doubt. People v. Bailey, 56 Ill App2d 261, 205 NE2d 756. See also People v. Manske.

Here the identity and the death of the victim are clearly established. The question of criminal agency is determined as a question of fact. Here a pathologist testified that the wound did not have the characteristics of a self-inflicted wound, and that it would be difficult for an individual to induce such wound by himself. The statement of the defendant that she struck her husband

with a knife establishes further facts relevant to the criminal agency. In People v. Manske, 399 Ill 176, at p 186, 77 NE2d 164, the defendant testified in a manner exculpating himself, and such testimony was deemed proof of facts going to establish the corpus delicti. Certain of defendant's admissions in evidence may be deemed of an exculpating character.

Defendant urges that there is affirmative evidence of self-defense and that upon such issue the prosecution failed to prove the defendant guilty beyond a reasonable doubt. Such theory of self-defense can only be found upon acceptance of the truth of defendant's statement to the police officers that she struck her husband with a knife because he was going to beat her again. We find no further evidence upon this issue.

■ Such statements, however, include the facts that the defendant and her husband were arguing in the living room, that she went to the kitchen, obtained the knife, returned and struck the decedent just inside the living room door. Discovery of drops of blood in this room corroborated such fact. It is in evidence that at one point defendant said that her husband was laughing at her as she went to get the knife. All of the evidence is that the defendant was the one who displayed high and profane anger. It is not apparent that the defendant claimed that she was actually being beaten, and the testimony is that there were no fresh marks or other evidence of violence observed upon the person of the defendant. The exculpating words only suggest a prospective beating. Even if one concludes that the evidence does not show the defendant acting as an angry aggressor, we must consider the Criminal Code of 1961, Chap 38, § 7–1 (Ill Rev Stats, 1961) which distinguishes the use of force to defend oneself against the imminent use of unlawful force from the use of force which is intended, or likely to cause death. We note the language, in part:

"... However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself. ..."

It is, perhaps, unnecessary to point out that striking a person in the chest with the point of a knife is likely to cause death. Under the circumstances in evidence there existed no reasonable ground for defendant to believe that it was necessary to stab the decedent to prevent imminent death or great bodily harm to herself. People v. Colson, 70 Ill App2d 447, 217 NE2d 348.

■ ■ Defendant argues that the testimony of the police officers contained conflicts in detail and criticizes the investigative steps employed. We cannot conclude that the evidence upon the elements of the offense are impeached by such conflicts of detail, many of which appear to arise from imprecise semantics and specifications of time. The testimony of numerous witnesses show substantial agreement of details as to the statements of the defendant, and under such circumstances defendant's admissions are acceptable evidence. People v. LaCoco, 406 Ill 303, 94 NE2d 178. We have noted defendant's argument suggesting possibilities that other persons may have caused the death. Whatever the importance of rebuttal evidence refuting such alternatives, it does not appear that the elimination of other possible offenders is a proper part of the State's case in chief.

The judgment of the trial court is affirmed.

Affirmed.

CRAVEN, P. J. and SMITH, J., concur.